22-3110-cr

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2024
Argued:  February 5, 2025
Decided: August 13, 2026

No. 22-3110

_____

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

KYLE M. LEEPER,

*Defendant-Appellant.*[*]

_____

Appeal from the United States District Court
for the Northern District of New York
No. 5:19-cr-0301, David N. Hurd, *Judge*

_____

Before:          PARKER, SULLIVAN, and BIANCO, *Circuit Judges*.

Defendant-Appellant Kyle Leeper appeals from a judgment entered by the United States District Court for the Northern District of New York (David N. Hurd, *Judge*) on November 29, 2022.  Leeper was convicted on his plea of guilty to one

_____

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

count of intentional murder while engaged in a controlled substance offense, in violation of 21 U.S.C. § 848(e)(1)(A); one count of conspiring to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A), 846; and one count of knowingly possessing a firearm and ammunition after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).  As part of his plea agreement, Leeper reserved the right to challenge the district court's denial of his pretrial motions, including his motions to suppress evidence seized from his vehicle and evidence obtained by taking a buccal swab of his DNA.

On appeal, Leeper challenges the denial of those motions, arguing that: (1) the search warrant affidavit did not establish probable cause to search his DNA because it did not identify any viable DNA samples with which his DNA could be compared; (2) the search warrant was invalid because it was issued *ex parte* even though there was no reason to proceed *ex parte*; and (3) the officers' decision to hold his vehicle was unreasonable under the Fourth Amendment, rendering the resulting search unreasonable as well.

For the reasons set forth below, we conclude that:  (1) the search warrant application established probable cause to search Leeper's DNA; (2) Leeper was not entitled to notice and an opportunity to be heard prior to the issuance of the search warrant, and thus the warrant was properly issued *ex parte*; and (3) the officers' decision to hold Leeper's vehicle was reasonable under the Fourth Amendment. Accordingly, we **AFFIRM** the judgment of the district court.

Judge Sullivan concurs in the judgment in a separate opinion.

_____

BENJAMIN SILVERMAN, Law Offices of Benjamin Silverman, New York, New York, *for* Defendant-Appellant.

STEVEN D. CLYMER, (Thomas R. Sutcliffe, *on the brief*), Assistant United States Attorneys, for John A. Sarcone III, United States Attorney for the Northern District of New York, *for* Appellee.

2

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Kyle Leeper appeals from a judgment of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*) entered on November 29, 2022. Leeper was convicted on his plea of guilty to one count of intentional murder while engaged in a controlled substance offense, in violation of 21 U.S.C. § 848(e)(1)(A); one count of conspiring to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A), 846; and one count of knowingly possessing a firearm and ammunition after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). As part of his plea agreement, Leeper reserved the right to challenge the district court's denial of his pretrial motions, including his motions to suppress evidence seized from his vehicle and evidence obtained by taking a buccal swab of his DNA.

On appeal, Leeper challenges the denial of those motions, arguing that: (1) the search warrant affidavit did not establish probable cause to search his DNA because it did not identify any viable DNA samples with which his DNA could be compared; (2) the search warrant was invalid because it was issued *ex parte* even though there was no reason to proceed *ex parte*; and (3) the officers' decision to hold his vehicle was unreasonable under the Fourth Amendment, rendering the

3

resulting search unreasonable as well.

For the reasons set forth below, we conclude that: (1) the search warrant application established probable cause to search Leeper's DNA; (2) Leeper was not entitled to notice and an opportunity to be heard prior to the issuance of the search warrant, and thus the warrant was properly issued *ex parte*; and (3) the officers' decision to hold Leeper's vehicle was reasonable under the Fourth Amendment. Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND[1]

Leeper was engaged in buying and selling methamphetamine in Indiana, California, and New York. In early 2019, he traveled to California along with a housemate, Ramon Nieves Cotto, to purchase methamphetamine. He was contacted by a woman named Arlene Rodriguez, who offered to help him purchase drugs. Rodriguez introduced Leeper to Robert Chavez, who arranged for Leeper to buy three pounds of methamphetamine for $5,000 from his supplier. Chavez met the supplier and exchanged Leeper's $5,000 for a backpack, which he gave to Leeper.

---

[1] The following facts, which are undisputed, are drawn from the Memorandum-Decision and Order entered by Judge Hurd on December 22, 2021, as well as the Plea Agreement that Leeper and the government entered into on May 11, 2022.

4

Later that day, Leeper discovered that there was substantially less than three pounds of methamphetamine in the backpack. In response, Leeper took Rodriguez hostage at gunpoint and forced her to take him back to Chavez. He then abducted Chavez, and the group drove around Los Angeles trying to get more money or drugs to recoup Leeper's loss. That night, Leeper ordered Rodriguez to drive to Walmart, where he instructed Cotto to purchase zip ties. Leeper then bound Chavez's hands and feet with the zip ties. With a bound Chavez in tow, Leeper then directed Rodriguez to drive to a deserted area near Barstow, California, where he removed Chavez from the car, led him away, and shot him in the back eight times, killing him. Cotto and Rodriguez remained in the car. Leeper returned to the car alone, and he, Cotto, and Rodriguez drove to Cortland, New York. Over the course of the trip, Leeper and Rodriguez developed a romantic relationship, and she continued to assist him with buying and selling methamphetamine.

On February 19, Leeper and Rodriguez were stopped by officers from the Cortland County New York Sheriff's Office ("CCSO") while Leeper was driving a pickup truck. The officers detained Leeper; held the pickup truck after learning that neither Leeper nor Rodriguez possessed a valid license and that the vehicle

5

did not have a valid registration; and conducted an inventory search of the truck, where they found a firearm, ammunition, and four pounds of methamphetamine. The officers then arrested Leeper and Rodriguez.

Following her arrest, Rodriguez told CCSO officers that Leeper smoked methamphetamine, that she believed he was selling methamphetamine, and that she had seen him with both a hand gun and a stun gun. In addition, Rodriguez's attorney told CCSO officers that Rodriguez was present during Chavez's murder and was willing to speak with the officers about it. A few weeks later, CCSO officers were contacted by a detective in California who was investigating Chavez's homicide.

On April 8, a Cortland County judge issued a warrant to search Leeper's person for evidence of second-degree murder, including by collecting his DNA from a buccal swab. The warrant was issued based on a probable cause affidavit submitted by Sergeant Garry Williams of the CCSO. Leeper was in custody at the time. The search warrant identified various pieces of physical evidence found at the scene of the homicide, including eight .380 caliber fired cartridge casings, seven .380 caliber projectiles, and cut zip ties.

In 2021, Leeper moved to suppress both the evidence found in his vehicle

and evidence derived from the DNA sample. Following an evidentiary hearing, the district court denied both motions. *See generally United States v. Leeper*, 577 F. Supp. 3d 48 (N.D.N.Y. 2021). With respect to the vehicle search, the district court found that, under the totality of the circumstances, the officers' decision to tow Leeper's truck was reasonable because neither passenger was licensed to drive it, the truck had no valid registration, and the truck had a severely cracked windshield, making it unfit for driving. *Id.* at 63–64. The district court rejected Leeper's argument that the decision did not comport with department policy and was therefore unreasonable, noting that non-compliance with a department policy is not dispositive of the legality of a search and that "there is uncontradicted evidence that Wright complied with standard practice even if he had not strictly followed the written policy."[2] *Id.* at 63.

With respect to the DNA sample, the district court found that there was probable cause for the warrant to issue, given that there was substantial evidence linking Leeper to Chavez's murder and "any number of physical instrumentalities

---

[2] Below, Leeper also challenged his temporary detention and the decision to conduct an inventory search of his vehicle after it was taken into custody. He does not pursue these arguments on appeal. *See Chevron Corp. v. Donziger*, 990 F.3d 191, 203 (2d Cir. 2021) ("Arguments not raised on appeal are deemed abandoned and need not be reviewed by this Court.").

7

explicitly tied to Chavez's murder."[3] *Id.* at 72. The district court also rejected Leeper's procedural due process challenge to the *ex parte* warrant proceeding, stating that "Leeper has failed to point to any support for the notion that the federal concept of due process would also require an opportunity to be heard before a search warrant could issue to seize DNA." *Id.* Accordingly, the district court denied Leeper's suppression motion in its entirety.

Ultimately, Leeper pleaded guilty to three counts: (1) intentional murder while engaged in a controlled substance offense; (2) conspiring to distribute methamphetamine; and (3) possessing a firearm knowing that he had previously been convicted of a felony. However, his plea agreement permitted him to appeal the district court's decision to deny his suppression motion as to: "(a) whether evidence located in and seized from the pickup truck occupied by Kyle M. Leeper and Arlene N. Rodriguez on February 19, 2019, should have been suppressed under the Fourth Amendment; and (b) whether a search warrant permitting the taking of a buccal swab from Kyle M. Leeper on or about April 10, 2019, was constitutionally invalid because it was issued without a showing of probable cause and *ex parte*." App'x at 221. The plea agreement provided that if Leeper prevails

---

[3] Below, Leeper also argued that the warrant application was supported by insufficiently reliable evidence. Again, that argument is not raised on appeal.

8

on appeal, "he will be permitted to withdraw his guilty plea without penalty." *Id.* The district court ultimately sentenced Leeper to forty years in prison on both the murder charge and drug charge and ten years on the firearm charge, all to run concurrently. This appeal followed.

## DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. On appeal, Leeper asserts that the searches of both his DNA and his vehicle violated the Fourth Amendment and challenges the district court's denial of his motions to suppress that evidence.

"On an appeal challenging a district court's ruling on a motion to suppress evidence, we review its legal conclusions *de novo* and its findings of fact for clear error." *United States v. Iverson*, 897 F.3d 450, 459 (2d Cir. 2018). "In reviewing the denial of such a motion, we view the evidence in the light most favorable to the government." *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017) (alteration adopted) (internal quotation marks and citation omitted). "[W]e may affirm the denial of the suppression motion on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did

9

not rely." *United States v. Estrada*, 430 F.3d 606, 609–10 (2d Cir. 2005).

## I. DNA Search

As part of their investigation, CCSO officers obtained a warrant to search Leeper's person for evidence of second-degree murder, including by taking a buccal swab of his DNA. Leeper challenges the validity of the DNA search on two grounds. The first is substantive: Leeper argues that the warrant application failed to establish probable cause that his DNA was likely to contain evidence of a crime because it did not identify any relevant DNA samples with which Leeper's DNA could be compared. The second is procedural: Leeper argues that he was denied procedural due process because the officers obtained a warrant to take a sample of his DNA without providing him notice or an opportunity to be heard. We address each of these issues in turn.

### a. Probable Cause

In evaluating probable cause, a judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Due to this subjective standard, a reviewing court generally accords substantial

deference to the finding of an issuing judicial officer that probable cause exists, limiting our inquiry to whether the officer had a substantial basis for his determination." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Gates*, 462 U.S. at 236 ("A magistrate's determination of probable cause should be paid great deference by reviewing courts.") (internal quotation marks and citation omitted). "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984). Accordingly, the Supreme Court has "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Gates*, 462 U.S. at 236.

Leeper argues that there was no probable cause to search his DNA because the officers did not establish that there were any DNA samples with which to compare his DNA. His DNA alone, he argues, is useless; unless the officers established that there were usable DNA samples collected at the scene or in other relevant locations with which Leeper's DNA could be compared, there was no fair

11

probability that evidence of a crime would be found in his DNA on its own.[4]

While the parties point us to conflicting lower court authority,[5] this

_____

[4] As a threshold matter, the government's argument that Leeper failed to challenge the search warrant on these grounds below and therefore review in this court should be for plain error is without merit. While Leeper's pretrial motion below made the factually inaccurate argument that "there are no evidentiary items connected to the murder that are identified," it also argued that "flowing from that is the fact that no evidentiary items have been swabbed for DNA such that a comparison would be possible." Gov't App'x at 30. Accordingly, we consider whether, on *de novo* review, the district court erred in concluding that the search warrant for Leeper's DNA was supported by probable cause.

[5] *Compare, e.g.*, *United States v. Marshall*, No. 11-CR-00381, 2012 WL 2994020, at *3 (W.D.N.Y. July 20, 2012) ("Without evidence that the DNA samples recovered from the firearms are of a sufficient quality to be used for comparison purposes with the DNA the government seeks to obtain from the defendants, there is nothing to suggest that compelling defendants' DNA will lead to probative evidence in this case."); *United States v. Pakala*, 329 F. Supp. 2d 178, 181 (D. Mass. 2004) (holding, on a motion for an order to compel, that individuals should not "be subject to even the minimal intrusion of a swab DNA test unless it is first determined that any substance found on the firearm(s) has yielded a sufficient DNA profile for comparison"); *United States v. Robinson*, No. 11-CR-0325, 2011 WL 7563020, at *3 (D. Minn. Dec. 2, 2011) (finding no probable cause for taking a DNA sample where "the Government has provided no evidence that it has as yet even tested the firearm at issue in this case to see whether there is any retrievable DNA evidence to which any comparison of the DNA sample seized from Defendant can be made," because "the Fourth Amendment forbids intrusions on the mere chance that desired evidence might be obtained") (internal quotation marks and citation omitted); *United States v. Jennings*, No. 21-cr-60193, 2021 WL 5235292, at *8 (S.D. Fla. Nov. 10, 2021) ("[B]ecause the DNA sample from the firearm had not yet been analyzed, there was no probable cause to believe that the DNA from Defendant would yield relevant evidence."); *with, e.g.*, *United States v. Harrison*, 683 F. Supp. 3d 184, 205 (N.D.N.Y. 2023) (Hurd, *J.*) ("The fact that *other* magistrates in *other* judicial districts might have wanted to see a bit more from the search warrant affiant before signing off on a warrant does not vitiate the probable cause determination made in this case."); *United States v. Sedillo*, 297 F. Supp. 3d 1155, 1181 (D.N.M. 2017) ("[T]he Fourth Amendment does not require the United States to confirm that evidence collected—in this case, the clothing—will yield a viable DNA sample before swabbing the arrestees for DNA," because "[p]robable cause is not a

12

question—whether a search warrant application can establish probable cause without identifying usable DNA samples taken from physical evidence linked to the alleged crime—is one of first impression for federal appellate courts. Leeper asks us to resolve it conclusively by adopting a bright line rule that "[a]bsent any comparison DNA, there is no way to establish probable cause that a suspect's DNA will be evidence of anything." Appellant's Br. at 23. But "[p]robable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts, and as such is not readily, or even usefully, reduced to a neat set of legal rules." *Raymonda*, 780 F.3d at 113 (internal quotation marks and citations omitted).

We conclude that demonstrating probable cause to obtain a DNA sample will not *always* require the government to identify specific DNA samples for comparison. Nor will it *never* require such identification. The probable cause determination in these cases depends on any number of factors, including whether there is physical evidence that could link a particular suspect to a crime, how much

---

granular inquiry."); *United States v. Burkhalter*, No. 4:18-CR-00036-1, 2023 WL 2653388, at *5 (W.D. Miss. Mar. 27, 2023) (noting that "courts appear to be split on the issue" and finding "the reasoning set forth in *United States v. Sedillo . . .* persuasive"); *In re Search Warrant*, No. 24-MJ-02376, 2024 WL 1174726, at *7 (S.D. Fla. Mar. 18, 2024) (finding it sufficient that there was "probable cause to believe that [the defendant] possessed (and then tossed) the firearm, and that he *may have* deposited usable DNA on the firearm, ammunition, and holster") (emphasis added).

physical evidence there is, the type of physical evidence, and the like.

Here, there was probable cause to search Leeper's DNA. The search warrant application identified eight shell casings, seven projectiles, and multiple cut zip ties recovered at the scene of Chavez's homicide, as well as the rental car and Chavez's body itself, any or all of which could have contained usable DNA samples against which to test Leeper's DNA. Indeed, Leeper acknowledges that the government's contention that "Leeper would have had 'ample opportunity to deposit touch DNA' . . . is true." Appellant's Reply Br. at 18. The supporting affidavit does not establish with certainty that there would be a sample against which to compare Leeper's DNA, but that is not what the Fourth Amendment requires. "While probable cause requires more than a 'mere suspicion,' of wrongdoing, its focus is on 'probabilities,' not 'hard certainties.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal citations omitted). Probable cause "requires only such facts as make wrongdoing or discovery of evidence thereof probable." *Id.* at 157. The issuing court had a substantial basis for its determination that the plethora of physical evidence recovered from the scene made it probable that obtaining a DNA sample from Leeper would lead to the discovery of evidence of a crime. Accordingly, we conclude that the district court properly denied

14

Leeper's motion to suppress on this basis.

### b. Procedural Due Process

Leeper also challenges the warrant on a procedural ground: that he was denied procedural due process because the officers obtained an *ex parte* warrant to take a sample of his DNA, using a buccal swab, without providing him advance notice or an opportunity to be heard. "With respect to a claimed due process violation, we review the district court's factual determinations for clear error, while the constitutional significance of those findings, including the ultimate determination of whether due process has been violated, is reviewed *de novo*." *United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016) (alteration adopted) (internal quotation marks and citation omitted).

Leeper broadly argues that the uniquely revealing nature of DNA implicates core privacy interests, necessitating a pre-deprivation hearing. Moreover, Leeper asserts that, "had [he] been afforded notice and a chance to be heard, it is unlikely that the judge would have issued the search warrant for his DNA because it would have realized, through an adversarial proceeding, that Sergeant Williams' supporting affidavit failed to state probable cause that the DNA would yield evidence of a crime." Appellant's Br. at 28–29.

15

In advancing this argument, Leeper principally relies on *Mathews v. Eldridge*, 424 U.S. 319 (1976), which directs courts, in determining whether procedural requirements related to the deprivation of property or liberty interests are constitutionally sufficient, to apply a three-part balancing test that weighs the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

As an initial matter, the government argues that *Mathews* has no application to Fourth Amendment challenges. Leeper counters that the *Mathews* "test is applied to myriad cases that require balancing public and private interests in determining whether sufficient process was granted." Appellant's Reply Br. at 3.

To be sure, in the criminal context, we have applied the *Mathews* test in determining that a defendant found guilty after trial could not be detained pending appeal based on an *ex parte* showing by the government. *See United States v. Abuhamra*, 389 F.3d 309, 318, 332 (2d Cir. 2004). Furthermore, we have applied the *Mathews* test in addressing the process that was required before a prosecutor

16

could retain a vehicle as potential evidence pending a criminal proceeding. *See*

*Krimstock v. Kelly*, 464 F.3d 246, 253–55 (2d Cir. 2006) (applying *Mathews* and

concluding that "no full-dress adversarial hearing is required to review a

prosecutor's unilateral determination that a vehicle is needed as potential

evidence" and "district attorneys must be permitted to seek retention orders *ex*

*parte* so that defendants cannot use the hearings for discovery or to restrict the

prosecution's theories at trial").

Notwithstanding the application of *Mathews* to examine certain detention

and seizure issues in criminal proceedings, search warrants are different, from

both a historical and practical standpoint, and the government correctly notes that

"no federal appellate court has held that judicial review of search warrant

applications must comport with the *Mathews* procedural due process framework

or otherwise has suggested that *Mathews* plays a role in this context." Appellee's

Br. at 52. Indeed, without any reference to *Mathews*, the Supreme Court

unequivocally held over five decades ago that, when a law enforcement officer

applies for a search warrant, the proceeding "is necessarily *ex parte*, since the

subject of the search cannot be tipped off to the application for a warrant lest he

destroy or remove evidence."[6] *Franks v. Delaware*, 438 U.S. 154, 169 (1978); *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 321 (1972) ("[A] warrant application involves no public or adversary proceedings:  it is an ex parte request before a magistrate or judge."); *see also Times Mirror Co. v. United States*, 873 F.2d 1210, 1213–14 (9th Cir. 1989) ("[O]ur review of the history of the warrant process in this country indicates that the issuance of search warrants has traditionally been carried out in secret.  Normally a search warrant is issued after an *ex parte* application by the government and an *in camera* consideration by a judge or magistrate.").  Thus, we have serious doubts as to whether the *Mathews* test should be applied at all to potentially impose additional procedural rules beyond what is required under the Fourth Amendment.  *See Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975) ("The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial."); *see also*

---

[6]  In *Winston v. Lee*, 470 U.S. 753 (1985), the Supreme Court left open the question of whether "special procedural protections" are warranted under the Fourth Amendment when the search involves "[a] compelled surgical intrusion into an individual's body for evidence," such as an order for a suspect to undergo surgery to remove a bullet lodged in his body.  *Id*. at 759, 763 n. 6.  No such surgical intrusion is at issue in this case, which involves only the use of a buccal swab.

*Abuhamra*, 389 F.3d at 328 (rejecting the "view that *ex parte* submissions at bail hearings are analogous to *ex parte* submissions in support of arrest and search warrants, or wire-tap authorizations" and noting that "[t]he competing interests at stake in connection with the issuance of warrant and wire-tap authorizations confer no pre-issuance right to an adversarial hearing on any person").

However, we need not resolve that issue here because we hold that, even assuming *arguendo* that *Mathews* applies to *ex parte* warrants for DNA collection with a buccal swab, the three-part test does not require the government to give notice and an opportunity to be heard because the government's compelling law enforcement interests in being able to obtain *ex parte* warrants for DNA collection outweigh an individual's private interests and the risk of erroneous deprivation in the absence of that procedure.[7] We address each of the *Mathews* factors below.

---

[7] We note that New York state courts have recognized a due process right to notice and an opportunity to be heard when law enforcement seeks a search warrant for an uncharged suspect's DNA in non-exigent circumstances. *See, e.g.*, *People v. Fomby*, 103 A.D.3d 28, 29–30 (N.Y. App. Div. 2012) (citing *Matter of Abe A.*, 437 N.E.2d 265 (N.Y. 1982), which concerned a search warrant for an uncharged suspect's blood sample). However, the New York Court of Appeals has clarified that the suspect's right to be heard is limited to "the nature of the bodily intrusion to be authorized by, and the evidence to be collected under, the warrant," and he is not entitled to challenge the probable cause showing in the warrant application, which is what Leeper seeks here. *People v. Goldman*, 159 N.E.3d 772, 781 (N.Y. 2020); *id.* ("The constitutional role of the neutral magistrate to determine whether the warrant application set forth probable cause of defendant's commission of the crime and the factual basis for the DNA comparative evidence set forth in the warrant

19

### i. The Government's Interest

As our holding rests on the conclusion that the government has overriding interests in being able to conduct *ex parte* warrant proceedings for DNA collection in the context of an ongoing criminal investigation, we begin with this step of the *Mathews* test.

It is beyond dispute that the collection and analysis of DNA are critical tools used by the government to accurately identify individuals responsible for criminal conduct, and the government has a "compelling interest in finding, convicting, and punishing those who violate the law." *Moran v. Burbine*, 475 U.S. 412, 426 (1986); *see also Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be

---

application required no supplemental adversarial process. Thus, the method and procedures employed in taking the saliva undoubtedly respected relevant Fourth Amendment standards of reasonableness, and defendant's claim that the failure to provide him discovery of the extant probable cause and an adversarial hearing nonetheless warrants the invocation of the exclusionary rule is without constitutional basis."). The court also concluded, because the procedure was constitutionally sufficient, it was "not necessary to address the People's arguments that *Abe A.*'s notice procedure preceding the issuance of a search warrant is no longer required for the minimal intrusion occasioned by a buccal swab or that the notice procedure does not apply to a suspect who is in custody." *Id*. In any event, federal law, not state law, applies to this federal criminal prosecution. *See United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir. 1987) ("[W]e are persuaded that federal law should apply to this federal criminal prosecution, even though the underlying investigation leading to prosecution was conducted solely by state officials.").

doubted.") (internal quotation marks and citation omitted); *Nicholas v. Goord*, 430 F.3d 652, 669 (2d Cir. 2005) ("There can be little doubt that New York has a strong government interest in obtaining identifying information from convicted offenders [through DNA collection] and keeping a record of such information [in a DNA database].").

That compelling interest in accurate investigations and prosecutions obviously includes using DNA analysis to exonerate the innocent. *See, e.g.*, *United States v. Sczubelek*, 402 F.3d 175, 185 (3d Cir. 2005) (emphasizing that "DNA samples will help to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit and will help to eliminate individuals from suspect lists when crimes occur"); *see also Kaemmerling v. Lappin*, 553 F.3d 669, 680 (D.C. Cir. 2008) (recognizing, in the context of a challenge to the collection and retention of DNA in a database, that there is a "compelling governmental interest in accurately and expeditiously solving past and future crimes in order to protect the public and ensure conviction of the guilty and exoneration of the innocent"). Often the government cannot advance these compelling interests without obtaining a search warrant to collect the DNA sample that is necessary for comparison purposes.

21

The rationale for the longstanding rule that the government should be able to submit search warrant applications *ex parte* is also quite obvious: if notice and an opportunity to be heard were required prior to a search warrant being issued, the criminal investigation could be compromised in numerous ways including, *inter alia*, by the destruction of evidence or other efforts to obstruct justice, as well as by one or more targets of the investigation fleeing from potential prosecution. *See Franks*, 438 U.S. at 169 ("The pre-search proceeding is necessarily *ex parte*, since the subject of the search warrant cannot be tipped off to the application for a warrant lest he destroy or remove evidence."); *United States v. Ulbricht*, 858 F.3d 71, 107 (2d Cir. 2017) (affirming denial of a request to unseal a document regarding a grand jury proceeding because "potential co-conspirators might have learned of the investigation and attempted to intimidate witnesses or destroy evidence"), *overruled on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018).

Leeper, although recognizing that "the government has a strong interest in obtaining DNA evidence," argues that these compelling reasons for an *ex parte* warrant do not apply to the collection of DNA from a suspect because (1) "the DNA [sought] from the suspect's body cannot be spoliated, not even if the suspect dies," and (2) "the suspect must be informed before the sample is taken from their body,

22

so the warrant cannot be executed while maintaining a confidential investigation."

Appellant's Br. at 28.

These arguments miss the mark. Although the suspect's DNA cannot be spoliated and the existence of the criminal investigation is necessarily exposed to the suspect by the collection of the DNA, there remains a host of means for the suspect, as well as any co-conspirators, to impede the investigation. In particular, Leeper overlooks the critical fact that his proposed right to notice and an opportunity to be heard before the issuance of the warrant would include providing a copy of the warrant application to the suspect while the investigation is still pending, or even at its infancy. That application, which must contain information sufficient to establish probable cause to authorize the DNA collection, could provide the suspect (and anyone else to whom that suspect shares that information) with confidential details about the witnesses and evidence gathered so far in the investigation, including grand jury material, as well as potentially shed light on law enforcement's theory of the case and knowledge of the role of any co-conspirators. Armed with this roadmap of the scope and status of the government's investigation, the suspect (even if in custody), as well as any co-conspirators in the criminal activity (whether known or unknown to law

23

enforcement), could engage in all types of obstruction of that investigation, including destroying other non-DNA evidence not yet obtained by law enforcement and intimidating or tampering with potential witnesses.

Moreover, the suspect (if he is not already in custody) could flee the jurisdiction once he is given notice of the search warrant application, thereby thwarting the collection of the DNA from him or any future criminal prosecution. Even if the suspect is in custody, any non-incarcerated co-conspirators would have their own opportunity to flee, especially if the warrant application were made known to them and revealed that the investigation was well-developed and additional arrests were imminent. *See Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 611 (2d Cir. 1988) ("[T]argets learning of their possible indictment might flee or tamper with . . . witnesses."). Indeed, these compelling law enforcement interests in protecting the confidential details of an ongoing criminal investigation are precisely why government applications for search warrants typically remain sealed until after the target is arrested.

Other courts have similarly recognized the compelling government interests in maintaining the confidentiality of search warrant applications while an investigation is pending. For example, in *Matter of EyeCare Physicians of America*,

24

100 F.3d 514 (7th Cir. 1996), companies whose premises were searched pursuant to warrants filed a motion to have the search warrant applications and affidavits unsealed to allow them to assess whether to challenge the government's search. *Id.* at 515. In affirming the denial of the motion, the Seventh Circuit noted that disclosure of the affidavits would breach the secrecy of the grand jury investigation and outlined other potential adverse ramifications from such a disclosure:

> Additional consequences in disclosing the sealed affidavits include: the identity of unnamed subjects not yet charged would be revealed; there may be mistaken notions concerning who might and might not be cooperating with the government or who may be subjects; there may be misunderstandings about the parameters of the government's investigation; the privacy of the innocent and the implicated would be threatened; and the cooperation of present and potential witnesses could be compromised or influenced. . . . We agree with the magistrate judge and the district court that disclosure of the affidavits might very likely impair the ongoing criminal investigation.

*Id.* at 519; *see also Media Gen. Operations v. Buchanan*, 417 F.3d 424, 429 (4th Cir. 2005) (holding that there was no right to view the sealing orders for the search warrant prior to the execution of the warrant and emphasizing that "[a] rule to the contrary would endanger the lives of officers and agents and allow the subjects of the investigation to destroy or remove evidence before the execution of the search warrant"); *In re Search Warrant for Secretarial Area Outside Off. of Gunn*, 855 F.2d 569,

25

573 (8th Cir. 1988) ("[T]he very objective of the search warrant process, the seizure of evidence of crime, would be frustrated if conducted openly.").  It is likewise not hard to imagine how one or more of these adverse consequences to an ongoing criminal investigation could potentially result from the disclosure of a search warrant application to collect DNA from a suspect, even when the suspect is in custody.

In addition to the damage that could arise from disclosure of the details of the search warrant application, the delay that would inevitably result from pre-seizure notice and an opportunity to be heard could similarly impede criminal investigations where time is often of the essence and any delay could jeopardize public safety.  *See generally In re Sealed Case*, 77 F.4th 815, 828 (D.C. Cir. 2023) ("Time is of the essence when the government seeks evidence needed in a criminal case, so there may be little opportunity to fully litigate a substantial constitutional claim while holding in abeyance the execution of a search warrant.").  Importantly, in many instances, the delay could be substantial because a suspect may need time to retain an attorney, the attorney will then need time to prepare a motion to which the government will need to respond, and the court may be required to hold an evidentiary hearing.  As the Supreme Court has explained, "[t]his Court has

26

recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (collecting cases); *see also Parratt v. Taylor*, 451 U.S. 527, 539 (1981) ("[E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process."); *accord Catanzaro v. Weiden*, 188 F.3d 56, 61–63 (2d Cir. 1999). Those are precisely the circumstances present here.

Although Leeper notes that the government sometimes opts to proceed by way of a court order to extract DNA with notice to the suspect when that suspect is already in custody, that voluntary decision by the government—in some circumstances where they have determined that obstruction of justice and flight are not substantial risks in that particular investigation or prosecution—does not support the argument that the government should be *required* to give notice in any such situation. *See Times Mirror Co.*, 873 F.2d at 1217 (concluding that "the fact that search warrants and supporting affidavits are often filed with the district court

without seal . . . merely describes a practice in cases where the government presumably believes secrecy is unnecessary" and does not demonstrate that sealing is never warranted). For example, the government may voluntarily opt to seek a court order to collect DNA with notice (rather than seek an *ex parte* search warrant) when an incarcerated defendant has already been arrested for the crime, is believed to have acted alone in connection with the crime, and is either already aware of the details of the investigation from discovery already provided to his counsel in the criminal case or is not in a position to destroy the evidence or intimidate the witnesses supporting his current prosecution. Those circumstances are a far cry from other situations where the risks to the investigation from disclosure of the warrant application remain high at the time of the DNA collection, such as where an investigation is far from complete, its details are unknown, and/or co-conspirators remain at large.

Leeper also suggests that the government should be required, in each individual situation involving a request to extract a person's DNA, to demonstrate that there are sufficient law enforcement reasons to justify an *ex parte* application. *See* Appellant's Reply Br. at 14 ("[I]f . . . the government has a reason to make the application *ex parte*, then it can explain the reasons at that time; but that is not

grounds to allow, by default, all requests to extract a person's DNA to be made *ex parte* and without prior notice to them."). In other words, under Leeper's approach, when the government seeks an *ex parte* search warrant to collect DNA from a suspect, the government should be required in each case to "present[] exigent circumstances warranting the postponement of notice and the opportunity for an adversarial hearing." *United States v. 4492 S. Livonia Rd.*, 889 F.2d 1258, 1265 (2d Cir. 1989). We disagree.

To be sure, "[t]he determination of whether one is entitled to a pre-deprivation hearing is fact-specific, as 'due process is flexible and calls for such procedural protections as the particular situation demands.'" *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 319 (2d Cir. 2002) (quoting *Mathews*, 424 U.S. at 334). However, for the reasons discussed above, it is clear that requiring the government to demonstrate exigent circumstances warranting an *ex parte* search application in each individual case where DNA collection is sought from a suspect (even if such a rule is limited to incarcerated suspects) is unworkable and insufficient to protect the government's compelling interest in, *inter alia*, maintaining the confidentiality of its search warrant application, especially because it is often difficult for the government to identify and articulate at the time of that application exactly how

or where a target or his co-conspirators could undermine the investigation if provided with the search warrant application. Indeed, law enforcement officers routinely obtain *ex parte* search warrants to gather all types of evidence that belong to (or implicate the privacy interests) of an incarcerated individual, including from his or her home, car, rental space in a storage facility, computer, cellphone, email account, or social media accounts. No court has suggested, nor does Leeper even suggest, that the government should be required to provide sufficient justification for the *ex parte* nature of the application in each and every one of those situations simply because the individual is incarcerated and thereby may not be able to personally undermine the investigation if he is provided with notice and an opportunity to be heard before the issuance of the warrant. Instead, in each of those situations, the compelling law enforcement reasons for maintaining the secrecy of the investigation and the often unknowable risks of disclosing the application to the target of the investigation, even when the target is incarcerated, would be undermined by any such case-by-case requirement. All of those compelling justifications supporting *ex parte* warrants in those situations apply with equal force to a search warrant that seeks the collection of DNA from a suspect like Leeper, even when he is in custody. In short, under *Mathews*, the

30

particular demands of the search warrant application process, including the practical realities and exigencies of ongoing criminal investigations and the importance of maintaining the confidentiality of search warrant applications during that investigation, support allowing the government to seek a search warrant for the collection of a DNA sample from a suspect without providing that suspect with notice and an opportunity to be heard at the time of the warrant application.

### ii. Leeper's Private Interests

With respect to the *Mathews* factor that considers the private interests impacted by the government's action, Leeper argues that DNA is different than other forms of evidence routinely seized from a target in that he has an "exceptionally high interest in the privacy of his genetic makeup" as once it is extracted and "posted on government databases," "it is forever in the public sphere." Appellant's Br. at 32–33. Leeper further asserts that his DNA sample could be used to reveal his "medical history, family history, and aspects of [his] sexual history"—*i.e.*, intimate personal details that should be afforded a high degree of privacy. *Id*. at 33. As set forth below, we conclude that these privacy interests are insufficient to outweigh the government's compelling justifications

31

for obtaining *ex parte* warrants to collect DNA evidence.

As a threshold matter, it is important to note that the *ex parte* warrant in this case only authorized the *collection* of DNA via a buccal swab. The Supreme Court has held that buccal swabs amount to only a "negligible" intrusion on one's person. *Maryland v. King*, 569 U.S. 435, 446 (2013) (describing a buccal swab as a "gentle process" that "involves but a light touch on the inside of the cheek"). Indeed, we have noted that, even an intrusion to take a blood sample, "while subject to the Fourth Amendment, is minimal," and "where inmates are routinely subject to medical procedures, including blood draws, and where their expectation of bodily privacy, while intact, is diminished, the intrusiveness of a blood draw is even further minimized." *Goord*, 430 F.3d at 669 (internal citations omitted).

We recognize that, by testing the saliva sample from the buccal swab, the government will have access to the suspect's DNA, which can reveal intimate details about him. This access to such details, however, does not necessarily lead to the conclusion that a special constitutional rule is required with respect to the collection and analysis of that type of evidence in a criminal investigation. For example, in the context of a Fourth Amendment analysis, numerous courts have held that, if law enforcement obtains an individual's saliva (or some other bodily

material) that has been abandoned in a public place, no search warrant is required before the DNA from that sample can be analyzed—notwithstanding the intimate details that could be revealed from it. *See, e.g.*, *Emerson v. Kelly*, No. 1:14-cv-00809, 2015 WL 3968250, at \*14 (N.D. Ohio June 30, 2015) ("[A] person has no reasonable expectation of privacy in his or her DNA profile extracted from a lawfully obtained DNA sample.") (internal quotation marks and citation omitted); *United States v. Scott*, No. 10-00027-01-CR, 2011 WL 5387601, at \*6 (W.D. Mo. Oct. 3, 2011) ("[T]he DNA obtained from the cup Defendant left on the coffee table should not be suppressed as the warrantless search of abandoned property does not violate the Fourth Amendment."); *see also United States v. Hicks*, No. 2:18-cr-20406, 2020 WL 7704556, at \*4 (W.D. Tenn. May 27, 2020) (noting that "[o]ther courts have found one's abandonment of an item containing his or her DNA sufficient to permit the government to conduct forensic analysis on that sample without a warrant") (collecting cases). In any event, for due process purposes, we conclude that any additional privacy interests that a suspect in a criminal investigation has in the DNA material of a sample lawfully obtained pursuant to a search warrant do not sufficiently outweigh the compelling justifications that exist, as discussed *supra*, for not requiring law enforcement to give that suspect notice and an opportunity

33

to be heard in connection with the search warrant application for that sample.

Although Leeper suggests that his proposed exception to the general rule that *ex parte* search warrants are permitted would be a narrow one because of the unique nature of DNA and the personal details revealed by its examination, we have our doubts about the narrowness of the rule he proposes. Indeed, if the ability of a search warrant to reveal intimate details of a person's life were sufficient under the Due Process Clause to prompt a requirement of notice and an opportunity to be heard at the time of the search warrant application, then many types of search warrants would undoubtedly fall within that rule. For instance, in *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court emphasized that cellphones are functionally "a digital record of nearly every aspect of [a person's] li[fe]—from the mundane to the intimate." *Id.* at 395. Cellphones may contain intimate conversations with loved ones, GPS locations, medical and business files, and real-time monitoring of health statistics, among other revealing information. *Id.* at 394–96, 403. Moreover, since the decision in *Riley* over ten years ago, technology has only evolved and the types and volume of information that may

34

be stored on an electronic device has increased exponentially.[8]  Thus, electronic devices may hold just as much "vast and sensitive" information—if not more—than a DNA analysis.  Appellant's Br. at 31.  Yet adopting Leeper's reasoning would seemingly prevent law enforcement from proceeding with an *ex parte* warrant application to obtain the contents of a cellphone already in police custody and owned by an incarcerated person.  No court has suggested that such a rule exists with respect to cellphones, and, in our view, Leeper's reasoning would fundamentally change the warrant application process for many types of searches, particularly for suspects who are incarcerated, and run the risk of severely impeding law enforcement across a broad spectrum of investigations.

Finally, with respect to his private interests, Leeper points out that the invasion of privacy is magnified with respect to the collection of DNA because it is maintained in a public database.  We have acknowledged, in connection with the extraction and analysis of convicted felons' blood for DNA-indexing purposes pursuant to a statute, that DNA collections constitute multi-tiered "intrusions" on the subject of the collection—a first "physical intrusion" occurs when the DNA

---

[8]  For example, there are now applications available that allow a person to upload and analyze their DNA data to their cellphone, which would likewise be available to law enforcement during a cellphone search. *See What we do*, GENOMAPP (last visited March 9, 2026), https://genomapp.com/en/what-we-do/ [https://perma.cc/R5GL-YZSJ].

sample is actually taken, and a second occurs during the "analysis and maintenance of [the] DNA information," which we have explained is a "potentially a far greater intrusion than the initial extraction," since the obtaining entity may "maintain[] DNA records indefinitely." *Goord*, 430 F.3d at 669–70 (upholding New York's DNA database statute against a Fourth Amendment challenge).

Here, although we likewise recognize the privacy concerns implicated by the ability of law enforcement to maintain the DNA permanently in a national database, Leeper overlooks the substantial safeguards that exist with respect to those concerns. As a threshold matter, contrary to Leeper's suggestion, the collection of a DNA sample does not necessarily lead to nationwide publication of that sample in the database. As the government correctly points out, it is only *after* a conviction that maintenance on the national index would be required. *See* 34 U.S.C. § 40702(a)(1)–(2); *see generally United States v. Amerson*, 483 F.3d 73, 86 (2d Cir. 2007) (explaining that, once a defendant is convicted, the "expectation of privacy in his or her identity is severely diminished"). Furthermore, there are numerous safeguards governing the use and maintenance of DNA information within the national index. For example, DNA information may only be disclosed

in limited circumstances and to a limited number of actors: (1) to criminal justice agencies for law enforcement purposes; (2) in judicial proceedings; (3) for criminal defense purposes; and (4) for population statistics databases and research, only if personally identifiable information is removed. 34 U.S.C. § 12592(b)(3). Consistent with these protections, if the subject of a DNA analysis is exonerated, acquitted, or the charges are dropped, DNA information may be expunged from the database. 34 U.S.C. § 12592(d)(1)–(2). Accordingly, it is not the case, as Leeper argues, that once DNA is collected, pursuant to an *ex parte* warrant or otherwise, that a suspect's DNA "is forever in the public sphere" without any safeguards.[9] Appellant's Br. at 33; *see Goord*, 430 F.3d at 671 ("Given the limits imposed on the collection, analysis, and use of DNA information by the statute, . . . the intrusion

---

[9] The *ex parte* warrant for Leeper's DNA collection was issued by a state judge in Cortland County, New York. That the warrant originated in the state judicial system does not impact our analysis with respect to these procedural safeguards. In *Goldman*, the New York Court of Appeals emphasized that "[New York law] demands an accredited state laboratory conform to the national DNA index system in developing the DNA profile from limited loci and imposes a similar duty to maintain confidentiality of the results of DNA testing to avoid unwarranted disclosures." 159 N.E.3d at 780 (citing, *inter alia*, New York Executive Law §§ 995-c, 995-d). Indeed, the court concluded, "[a]ssuming the applicability of those significant statutory safeguards, there is no need for an adversarial hearing to determine whether the collection of a DNA sample amounts to an unreasonable invasion of privacy in a particular case." *Id.* Moreover, when DNA information collected by a state or local criminal justice agency is included in the national index, the federal restrictions regarding use and disclosure apply. *See* 34 U.S.C. § 12592(b)(3).

on privacy effected by the statute . . . is insufficient to outweigh the state's strong interest in maintaining a DNA index."); *Roe v. Marcotte*, 193 F.3d 72, 80 (2d Cir. 1999) (finding sufficient safeguards in a DNA statute that "restricts access to and secures the confidentiality of the results and provides for the expungement of the results from the data bank upon the reversal or dismissal of a conviction") (internal citations omitted).

In sum, under the *Mathews* test, we conclude that Leeper's private interests in his DNA do not outweigh the government's compelling interests in conducting effective law enforcement investigations that are aided by the ability to obtain *ex parte* search warrants for DNA collection from a suspect, even when that suspect is incarcerated.

### iii. Risk of Erroneous Deprivation

Finally, we examine the *Mathews* factor that addresses the risk of erroneous deprivation—*i.e.*, the likelihood that holding pre-deprivation hearings prior to the issuance of DNA warrants would reduce the chance of erroneous outcomes. *See Mathews*, 424 U.S. at 335. As set forth below, we conclude that this factor does not support a requirement of notice and an opportunity to be heard before a search warrant for DNA collection is considered.

Importantly, even in the absence of any ability by a suspect to challenge the issuance of a search warrant, the Fourth Amendment guards against unreasonable searches and seizures by requiring the government to demonstrate probable cause to a judicial officer before the warrant can be issued. U.S. CONST. amend. IV. The Supreme Court has explained that the "long-prevailing constitutional standards of probable cause embod[y] the best compromise that has been found for accommodating the often-opposing interests in safeguarding citizens from rash and unreasonable interferences with privacy and in seeking to give fair leeway for enforcing the law in the community's protection." *Dunaway v. New York*, 442 U.S. 200, 208 (1979) (alterations adopted) (internal quotation marks and citation omitted). Thus, "an ex parte probable cause determination before a judicial officer reduces the possibility of an erroneous deprivation." *4492 S. Livonia Rd.*, 889 F.2d at 1265.

Moreover, the risk of erroneous deprivation is further minimized by the exclusionary rule, which functions to "deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 248 (2011); *see also Abuhamra*, 389 F.3d at 328 (distinguishing *ex parte* submissions at bail hearings from *ex parte* submissions in support of warrants and wire-tap applications because "[o]nce

such orders are executed . . . the *ex parte* submissions are generally unsealed—in the case of the arrest and search warrants, usually immediately—and parties whose liberty or property interests are affected are afforded opportunities to challenge the legality of the actions"); *United States v. Smith*, 575 F. Supp. 3d 542, 555 (E.D. Pa. 2021) (holding that, because the police obtained the defendant's DNA sample in violation of the Fourth Amendment, "the exclusionary rule compel[led] the suppression of any evidence of Defendant's DNA sample and the forensic analyses derived from it as the tainted fruit of unlawful government conduct") (internal quotation marks and citation omitted). Here, following his indictment in federal court, Leeper had the opportunity to challenge the probable cause determination for the issuance of the warrant which, as discussed *supra*, the district court correctly rejected.

These safeguards are sufficient under these circumstances to protect a suspect who is the subject of DNA collection pursuant to an *ex parte* search warrant from a violation of his Fourth Amendment rights in connection with the issuance of the warrant or an erroneous outcome in his criminal proceeding. *See generally United States v. Grubbs*, 547 U.S. 90, 99 (2006) ("The Constitution protects property owners not by giving them license to engage the police in a debate over the basis

for the warrant, but by interposing, *ex ante*, the deliberate, impartial judgment of a judicial officer . . . between the citizen and the police, and by providing, *ex post*, a right to suppress evidence improperly obtained and a cause of action for damages.") (internal quotation marks and citation omitted).

Leeper again argues that a different rule is required in the context of DNA collection because the deprivation resulting from any unconstitutional action by law enforcement is more damaging when DNA is collected, as compared to other types of searches. We are unpersuaded. Neither the Supreme Court nor any other circuit court has ever suggested that the *ex parte* process for obtaining of search warrants should be abandoned because the searches may involve substantial bodily intrusions, such as body cavity searches, *see, e.g.*, *Sloley v. VanBramer*, 945 F.3d 30, 40 (2d Cir. 2019), or the collection of evidence from an individual's residence, *United States v. Sandalo*, 70 F.4th 77, 79 (2d Cir. 2023), or a cellphone, *Riley*, 573 U.S. at 403, and we can discern no reason to depart from that process where the search involves the collection of a DNA sample with a buccal swab for the purposes of DNA analysis in a criminal investigation.

\*     \*     \*

In sum, under the *Mathews* test, we conclude that the government's

41

compelling interests in the confidentiality of the search warrant application for the collection of a suspect's DNA sample during an ongoing investigation are sufficiently strong—even when the suspect is incarcerated—to outweigh the private interests implicated by that search. Moreover, the existing procedural safeguards for an *ex parte* application, as well as the ability of the suspect in any subsequent criminal proceeding to challenge any evidence seized pursuant to the warrant, are sufficient to guard against the risk of erroneous deprivation. Therefore, even assuming *arguendo* that the *Mathews* test applies to *ex parte* search warrants for the collection of a DNA sample from a suspect via a buccal swab, the government is not required under *Mathews* to provide notice and an opportunity to be heard in connection with that warrant application, whether or not that suspect is already in custody. Accordingly, the lack of notice to Leeper in connection with his search warrant was not a constitutional violation, and it provides no basis to disturb his conviction.

## II.    Vehicle Inventory Search

Finally, Leeper challenges the hold and related search of his vehicle, arguing that the fruits of this search should be suppressed. Leeper's challenge fails because the officers' decision to hold his car did not violate the Fourth Amendment.

42

When considering similar questions, "[s]ome courts have concluded that there are two inquiries: first, whether the impoundment of a car is reasonable; and second, if so, whether the subsequent search of the car after the impoundment is reasonable." *United States v. Lyle*, 919 F.3d 716, 730 n.2 (2d Cir. 2019). This case involves only the former question. Leeper does not challenge the CCSO policy requiring an inventory search for vehicles that are properly impounded or held, nor does he challenge the decision to search the vehicle itself as unreasonable. Leeper argues only that the decision to hold his truck, which in turn triggered the search, was unreasonable and pretextual—not that conducting an inventory search was independently unreasonable once that decision had been made. As in *Lyle*, where the defendant "challenged only the impoundment and not the subsequent search of the rental vehicle," we "need not reach the second inquiry." *Id.*

Turning then to the question whether the officers' decision to hold Leeper's vehicle was reasonable, we start with the well-established notion "that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions—an authority that is beyond reasonable challenge." *Id.* at

728. "[U]nder this community caretaking exception to the warrant requirement, police officers may exercise their discretion in deciding whether to impound a vehicle, so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id.* (internal quotation marks and citation omitted).

We have consistently held that officers' decisions to seize and remove vehicles were reasonable in circumstances where, due to arrests, suspended licenses, or other reasons, no driver would be available to remove the vehicle from its location. In *Lyle*, where the car's driver and sole occupant had a suspended license, this Court reasoned that "by impounding the vehicle, the officer ensured that the rental vehicle was not left on a public street in a busy midtown Manhattan location where it could have become a nuisance or been stolen or damaged and could have become illegally parked the next day." *Id.* at 731. The same was true in *United States v. Lopez*, where "the circumstances called for the impoundment of [Lopez's] car, as Lopez was arrested for driving it while intoxicated." 547 F.3d 364, 372 (2d Cir. 2008).

The same reasoning applies here. As the district court found, Leeper's vehicle had an expired registration, such that no one could lawfully drive it away;

even if someone could, neither Leeper nor Rodriguez had a valid license. In these circumstances, the officers' decision to hold the truck was reasonable.

Leeper's arguments to the contrary are unpersuasive. First, Leeper argues that the decision to impound his vehicle was unreasonable because the CCSO officers did not adhere to their standardized written procedures. This is neither true nor dispositive. The district court found that "there is uncontradicted evidence that Wright complied with standard policy." App'x at 184. Although Leeper urges a different interpretation of the policy, he provides no reason to disturb the district court's finding, which was supported by Officer Wright's testimony about the policy. And regardless, "[w]hile the existence of and an officer's adherence to a standardized criteria may be helpful in evaluating the reasonableness of an impoundment, we decline to adopt a standardized impoundment procedure requirement." *Lyle*, 919 F.3d at 731.

Next, Leeper seeks to distinguish this case from *Lyle* and *Lopez*, noting the undisputed fact that his truck was parked in a commercial parking lot—not on a public street, as in *Lyle* and *Lopez*. That is true, but again it is not dispositive. Our inquiry does not turn on any one individual fact; "the touchstone of the Fourth Amendment is reasonableness, which, in turn, is measured in objective terms by

45

examining the totality of the circumstances." *Id.* (internal quotation marks and citation omitted). Here, as noted above, no one on the scene could lawfully drive the vehicle away from its location. Although it was in a private parking lot, Leeper had not sought permission to leave the truck there, there was no telling how long it would remain there, and it was certainly reasonable to conclude it might have "become a nuisance or been stolen or damaged." *Id.*

Last, Leeper claims the decision to impound the truck was pretextual and was simply an excuse to search it. But the sole basis for that claim is Leeper's *ipse dixit* that there was no community caretaking reason to impound the truck, which we have already rejected.

In sum, we hold that the officers' decision to hold the truck, which had neither a valid registration nor any driver who could remove it legally, was reasonable under the Fourth Amendment, and the fruits of the accompanying search need not be suppressed.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

RICHARD J. SULLIVAN, *Circuit Judge*, concurring in the judgment:

Although I agree with the majority's ultimate outcome, I write separately because I believe that *Mathews v. Eldridge*, 424 U.S. 319 (1976), is inapplicable to search warrants. I would hold as much, without assuming *arguendo* that *Mathews* does apply and then conducting the procedural due-process analysis that it requires.

It is well established that the standards governing searches and seizures are derived from the Fourth Amendment. The Supreme Court reached that conclusion more than fifty years ago. *See Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975). Holding that the Fourth Amendment is "tailored explicitly for the criminal justice system," the Court emphasized that only this Amendment's "balance between individual and public interests" could define the "process that is due" for searches and seizures involving criminal defendants. *Id.* Indeed, alternate analytic frameworks developed in the context of civil deprivations – such as *Mathews*'s due-process balancing test – are "irrelevant in the *wholly* different context of the criminal justice system." *Id.* (emphasis added). The reason is simple: the Fourth Amendment's original and enduring role is to "safeguard" citizens "from interferences with privacy and from unfounded charges of crime" while giving

"fair leeway" to the government to "enforc[e] the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176 (1949); *see also Gerstein*, 420 U.S. at 125 n.27 ("The Fourth Amendment probable cause determination is . . . the first stage of an elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct."). In other words, because the Fourth Amendment *already* strikes the proper balance between the public and private interests at stake in government searches, there is no need for additional balancing under the Due Process Clause.

In the context of search-warrant applications specifically, the Supreme Court has affirmed the constitutionality of *ex parte* proceedings in every case in which it has considered the question. In *United States v. United States District Court for the Eastern District of Michigan*, for example, the Court underscored that a search-warrant application is an "*ex parte* request before a magistrate or judge" involving "no public or adversary proceedings." 407 U.S. 297, 321 (1972). That same description appeared in *Franks v. Delaware*, where the Court reiterated that, as a general matter, search-warrant proceedings are "necessarily *ex parte*, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence." 438 U.S. 154, 169 (1978). Together, both cases leave

2

no doubt that the requirements of the Fourth Amendment – even when met *ex parte* – constitute all the "process that is due" when the government applies for a search warrant. *Gerstein*, 420 U.S. at 125 n.27 (internal quotation marks omitted).

Rather than holding that the Fourth Amendment alone governs search-warrant applications – and that it clearly countenances *ex parte* proceedings – the majority's opinion entertains the idea that *Mathews*'s procedural due-process framework could modify or even *trump* the Fourth Amendment analysis. *See* Maj. Op. at 16–17. While admitting that "search warrants are different" and that it has "serious doubts as to whether the *Mathews* test should be applied," the majority nonetheless decides that it "need not resolve that issue here" because "even assuming *arguendo* that *Mathews* applies to *ex parte* warrants for DNA collection with a buccal swab, . . . the government's compelling law enforcement interests . . . outweigh an individual's private interests." *Id.* at 17–18. To justify its decision to leave that issue for another day, the majority cites two cases that it believes lend credence to the view that *Mathews* may apply in search-warrant cases. *See id.* at 16–17. But neither decision stands for that proposition.

The first, *United States v. Abuhamra*, distinguishes between (i) proceedings to determine whether a defendant should be detained pending appeal – a context in

3

which we *did* apply *Mathews* – and (ii) search-warrant applications, in which we clarified that there is "no pre-issuance right to an adversarial hearing [for] any person." 389 F.3d 309, 328 (2d Cir. 2004). *Abuhamra*, in other words, *reaffirmed* the principle that the Fourth Amendment supplies all the "process that is due" in applications for search warrants. *Gerstein*, 420 U.S. at 125 n.27 (internal quotation marks omitted).

The second case cited by the majority, *Krimstock v. Kelly*, concerned prosecutors' retention of private vehicles as evidence in potential criminal proceedings against the *drivers* – though not necessarily the *owners* – of those vehicles. 464 F.3d 246, 253 (2d Cir. 2006). Although we did apply *Mathews* in *Krimstock*, we did so only because the case "involve[d] the deprivation of property" affecting challengers who might be "innocent owner[s] who [were] no[t] part[ies] to the criminal proceeding[s]." *Id.* at 254. Noting that it would be "redundant" and "inconsistent" to apply the "vaguer notion of 'due process'" to "criminal proceedings" governed by the Bill of Rights, we explained that *Mathews* was relevant exclusively because neither party was challenging "an underlying criminal proceeding or the procedural rights due [a] criminal defendant." *Id.* Put simply, *Krimstock* is a deprivation of property case, *not* a criminal procedure or

4

search-warrant case.  Where search warrants are involved, there can be no doubt that the only "process that is due" is supplied by the Fourth Amendment.  *Gerstein*, 420 U.S. at 125 n.27 (internal quotation marks omitted).

In my view, the majority's willingness to entertain the applicability of *Mathews* to search-warrant applications is unjustified – and profoundly unwise. Both this Court and the Supreme Court have counseled against importing the *Mathews* scheme into the procedural framework enshrined in the Bill of Rights. Indeed, because the "Bill of Rights speaks in explicit terms to many aspects of criminal procedure," the "expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites interference with . . . the careful balance that the Constitution strikes between liberty and order."  *Medina v. California*, 505 U.S. at 443; *see also id.* ("[I]t has never been thought that decisions under the Due Process Clause establish this Court as a rule-making organ for the promulgation of . . . rules of criminal procedure." (alteration adopted and internal quotation marks omitted)); *Hines v. Miller*, 318 F.3d 157, 161 (2d Cir. 2003) ("We agree . . . that it is inappropriate to employ the *Mathews* balancing test in criminal cases.").  The danger is clear:  more process does not sharpen the Constitution's vision for criminal justice, liberty, and order; it risks *distorting* that vision.

5

Unlike the majority, then, I would use this opportunity to halt *Mathews*'s slow drift into criminal proceedings and instead rely on the "careful balance" that the Fourth Amendment strikes between "liberty and order." *Medina*, 505 U.S. at 443. Based on that authority, and that authority alone, I would uphold the *ex parte* search-warrant applications involved here as constitutional under the Warrants Clause. *See* U.S. Const. amend. IV. Because those warrants were undoubtedly based "upon probable cause, [were] supported by Oath or Affirmation, and particularly describ[ed] the place to be searched, and the person or things to be seized," *id.*, the requirements of the Fourth Amendment were clearly met. And those requirements – not *Mathews* – are all that matter here, since "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases." *Gerstein*, 420 U.S. at 125 n.27.